AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

xxxx 9th Street, NW
Washington, D.C.

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER:

(Further described below)

I    RICHARD ESPINOSA    being duly sworn depose and say:

I am a(n)   Detective with Metropolitan Police Department   and have reason to believe
            (Official Title)
that ☐ on the person of or ☒ on the property or premises known as  (name, description and or location)

**xxxx 9th Street, NW, Washington, DC** is a two story row home with a stone and brick front facade, having a lower half of multi-colored stone and an upper half of red brick. The unit has concrete steps on the right portion of the front with wood rails on each side of the steps. The steps lead to a white front door with a gold mail slot. The unit has a glass panel above the door, with "xxxx" in black numbers. The front facade has five windows, two on the left side of the front door, and three above the front door. The top left window has an air conditioning unit in the window. Two of the top three windows have green awnings above them. **AS FULLY DESCRIBED IN THE ATTACHED AFFIDAVIT**

concerning a violation of Title  18  United States Code, Section(s) § 513. The facts to support a finding of Probable Cause are as follows:

**SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED HEREIN**

Continued on the attached sheet and made a part hereof.    ☒ YES   ☐ NO

DENISE M. CLARK
Federal Major Crimes Section
(202) 353-8213

Signature of Affiant
RICHARD ESPINOSA, DETECTIVE
Metropolitan Police Department

Sworn to before me, and subscribed in my presence

_____         at Washington, D.C.
Date

_____         _____
Name and Title of Judicial Officer          Signature of Judicial Officer

**AFFIDAVIT OF SUPPORT OF A SEARCH WARRANT**

I, Richard Espinosa, a Detective with the Metropolitan Police Department, being duly sworn, depose and say that:

1. I am a grade one detective with the Metropolitan Police Department, currently assigned to Financial Crimes and Fraud Section.

2. I have been a law enforcement officer for the past twenty four years. I joined the Metropolitan Police Department ("MPD") in 1982. I have spent the past twenty years serving as an Investigator/Detective Grade II/ Detective Grade I. I have had the opportunity to be a member of several investigative sections, including: Youth Division, Arson Squad, Sex Offense Branch, Homicide Branch, Domestic Violence Coordinator and Youth & Preventive Services Division ("YPSD"). I am currently the squad supervisor of the Fraud Unit. I have testified before the Grand Jury in connection with investigative matters in each of these sections. For several years, I was a critical member of the MPD/DEA joint federal taskforce, REDRUM, which investigated high profile homicides. Working as a member of the REDRUM Task Force, I assisted other police agencies (FBI, DEA, ATF, Montgomery County Police, King George's County and Prince George's County Police). My law enforcement training and experience include preparation, presentation and service of criminal complaints, arrest and search warrants. I have participated in the execution of over two hundred search warrants. I have been the affiant on affidavits in support of approximately one hundred search warrants. In addition, I have received training in general law enforcement and criminal investigations to include violations involving credit card fraud, forgery and theft statutes.

3. The information contained in this affidavit is based on my personal knowledge and observations during the course of this investigation; on information conveyed to me by other law

enforcement or government officials, and on my review of records, documents, and other physical evidence obtained during this investigation. This affidavit is not intended to include every fact observed by me or known to the government. The below stated took place within the District of Columbia.

4. This affidavit contains information necessary in support of an application for a search warrant to search all premises including the residential area, curtilage, outbuilding, and storage areas located at or corresponding to xxxx 9th Street, N.W., Washington, D.C. 20001, which is located within the District of Columbia. This property is more fully described in Attachment A of this affidavit.

5. The MPD's ongoing investigation has developed probable cause to believe that a person or persons have committed a serious felony offense against the United States in violation of Title 18, United States Code, Section 513 (Forgery of Securities of Private Entities) and probable cause to believe that the place described in the attachment to this affidavit contains evidence, contraband, instrumentalities and/or fruits of these offenses, which may be seized pursuant to this warrant that this affidavit supports.

STATEMENT OF FACTS SUPPORTING PROBABLE CAUSE

6. On or about September 26, 2006, the MPD received a complaint from Ted Loza, Chief of Staff District of Columbia Council Member Jim Graham, who, in addition to his other duties, oversees the "Friends of Jim Graham, Constituent Service Fund." Mr. Loza related that an unknown person(s) obtained an account number from a checking account drawn on an account

belonging to the Friends of Jim Graham, Constituent Service Fund (hereinafter, the "Jim Graham Fund Account") at Industrial Bank, a federally insured financial institution located in and around the District of Columbia. The person(s) had presented several forged and

counterfeited checks without Mr. Graham's permission, the signatory on Industrial Bank account number xxxxxxx. The counterfeit checks contained a forged signature of Mr. Graham and were made payable to various people whom the complainant does not know and did not provide with checks. From on or about September 13, 2006, to the present, seven counterfeit checks have been drawn from the Jim Graham Fund Account, resulting in a total loss of approximately $5,000.00.

7. During the course of its investigation, the MPD obtained copies of the checks fraudulently drawn from the Jim Graham Fund Account. The counterfeited checks appeared to be computer generated from the payor, "Friends of Jimm Graham, Constituent Service." In addition to the misspelling, the counterfeit checks listed the bank information for Industrial Bank and bore the identical account number for the Jim Graham Fund Account.

8. Upon receiving copies of the counterfeited checks, investigators from the MPD contacted and spoke with the payees who had cashed or otherwise negotiated the various counterfeited checks, drawing funds on the Jim Graham Fund Account. Based on the investigation, including discussions with the payees on the counterfeit checks for Jim Graham Fund Account, MPD investigators discovered a witness, Latisha Coles, who informed MPD investigators that a woman having the nickname "L.A.," who was later identified as Ladayta Artis, had produced counterfeit checks on a computer that was maintained at L.A.'s residence. Ms. Coles further alleged that L.A. had destroyed her home computer on or about Sunday, October 1, 2006, but did not indicate whether the computer had in fact been removed from L.A.'s residence.

9. A witness, who had cashed at least one of the counterfeited checks, stated that it obtained and cashed the check(s) through its association with two women known to it as "Tisha" and "L.A," later identified as Latisha Yvonne Coles ("Latisha Coles"), residing with her father at xxxx North Capitol Street, N.W., #xxx, in this District, and Ladayta Artis, residing at xxxx 9th

Street, N.W., Washington, D.C. The witness informed MPD that its mother also resided in xxxx North Capitol Street and it had known Latisha Coles for several years as a result of its connection to that building. The witness told MPD that it spoke with Latisha Coles about its needing money. Ms. Coles responded that she could help it out with obtaining additional money. In its presence, Ms. Coles made a telephone call to a female it knew as L.A., who was later identified as Ladayta Artis. During the telephone conversation, which was on speaker phone, Ladayta Artis asked for the witness's full name and correct spelling, and indicated that she needed them (it and Latisha Coles) to wait a minute for her to get a piece of paper to write its information down. Ms. Artis then said that she had to go to her residence for approximately fifteen minutes and that she would be at xxxx North Capitol Street, N.W., in approximately thirty minutes.

10. Approximately thirty minutes later that same day, Ms. Artis came to xxxx North Capitol Street, N.W., and gave a check to it, as well as several other individuals, after observing Ms. Artis forge a signature on each check. The check it received was a counterfeited check for the Jim Graham Fund Account.

11. The witness indicated that it received approximately five total checks from Ladayta Artis, four of which were counterfeited checks for the Jim Graham Fund Account and one was a counterfeit check from a private company that has a presence in the District of Columbia as a restaurant chain known as "Burger King."

12. The witness informed an MPD investigator that after it cashed the Burger King check in the District of Columbia at SunTrust Bank, on or about September 29, 2006, it split the money with Ladayta Artis and gave her a ride to xxxx 9th Street, N.W., Washington, D.C., which address she told the witness was her residence.

13. Based on additional investigation by investigators, MPD has learned that Ladayta Artis

resides at xxxx 9th Street, N.W., with Michelle ("Micky") Coles, who is the aunt of Latisha Coles.

14. Based on your affiant's training, experience, and participation in other investigations involving fraud against financial institutions, and based on my discussions with other Special Agents involved in this investigation concerning their experience with similar investigations, your affiant has learned that in such operations involving the use and creation of counterfeit checks, that the checks are often created using particular types of computer software available at office supply stores. Your affiant has further observed from his experience and that of other Special Agents involved in this investigation that the computers and computer software used to create the counterfeit checks and other records which evidence this type of crime are often kept at the homes of the perpetrators of such schemes, where they often prepare the counterfeit documents. Your affiant has further observed from his experience and that of other Special Agents involved in this investigation that the following kinds of evidence relevant to this type of investigation are usually recovered in the searches of the residence of an individual involved in the creation of counterfeit checks:

    A. Books, records, receipts, notes, ledgers, and other documents and materials relating to the production of counterfeit checks. The terms "records," "documents," and "materials" includes records in all forms, such as those on paper, in any photographic form, in any mechanical form, and any form that is stored in electronic or magnetic form on hard drives, compact discs, zip disks, magnetic tapes or floppy disks;

    B. Personal papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the production of counterfeit checks;

    C. Paper or computer records of files relating to the income or expenditure of money, inventory, costs, searches of internet sources relating to the production of

counterfeit checks;

D. Computer records or files reflecting names, addresses, telephone numbers, and other contact or identification data relating to the financial transactions, including computer software relating to the creation of business drafts or checks;

E. Cash or property obtained with illegal proceeds of criminal activity;

F. Any notes, day planners, calendars, chronologies and summaries of daily activities.

G. Any spreadsheets, databases, charts and tables related to daily activities in the use of computers.

H. Computer Equipment and storage device capable of being used to commit, further, or store evidence of the creation of counterfeit checks, including, but not limited to the following:

I. Computer Hardware

Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but is not limited to, any data-processing devices (such as central processing units); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers);and there stored information; and related communications devices (such as modems, cables and connections, recording equipment, RAM or

ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

ii. Computer Software

Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

iii. Computer-Related Documentation

Computer-related documentation consists of written, recorded, printed or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

iv. Passwords and Data Security Devices

Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit

boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

15. Based on the investigation conducted by your affiant, I submit that the facts stated in this affidavit establish that there is probable cause for a search warrant to be issued authorizing me, and any other assisting law enforcement officers, to search the premises known as xxxx 9th Street, N.W., Washington, D.C. 20001, which is further described in Attachment A of this affidavit, and to seize evidence, contraband, fruits and instrumentalities of the aforementioned violations, specifically the items listed in Attachment B of this affidavit.

_____
Richard Espinoza
Metropolitan Police Department

Sworn to and Subscribed before me this day of October 2006.

_____
Judge, United States District Court

ATTACHMENT A

a.)   xxxx 9th Street, N.W., Washington, D.C. is described as a two-story row home with a stone and brick front façade, having a lower half of multi-colored stone and an upper half of red brick. The unit has concrete steps on the right portion of the front with wood rails on each side of the steps. The steps lead to a white front door with a gold mail slot. The unit has a glass panel above the door, with "xxxx" in black numbers. The front façade has five windows, two on the left side of the front door, and three above the front door. The top left window has an air conditioning unit in the window. Two of the top three windows have green awnings above them.

ATTACHMENT B

The following is a list of items to be seized through the execution of this search warrant:

A. RECORDS

      a. Books, records, receipts, notes, ledgers, and other documents and materials relating to the production of counterfeit checks. The terms "records," "documents," and "materials" includes records in all forms, such as those on paper, in any photographic form, in any mechanical form, and any form that is stored in electronic or magnetic form on hard drives, compact discs, zip disks, magnetic tapes or floppy disks;

      b. Personal papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the production of counterfeit checks;

      c. Paper or computer records of files relating to the income or expenditure of money, inventory, costs, searches of internet sources relating to the production of counterfeit checks;

      d. Computer records or files reflecting names, addresses, telephone numbers, and other contact or identification data relating to the financial transactions, including computer software relating to the creation of business drafts or checks;

      e. Cash or property obtained with illegal proceeds of criminal activity;

      f. Any notes, day planners, calendars, chronologies and summaries of daily activities.

      g. Any spreadsheets, databases, charts and tables related to daily activities in the use of computers.

B. HARDWARE

Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but is not limited to, any data-processing devices (such as central processing units); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers);and there stored information; and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

C. SOFTWARE

Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word-processing, graphics, or spreadsheet programs), utilities, compilers, interpreters, and communications programs.

D. DOCUMENTATION

Computer-related documentation consists of written, recorded, printed or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

E. PASSWORDS and DATA SECURITY DEVICES

Computer passwords and other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.